UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JEFFREY EARL GRIMES           )
                              )
V.                            )        NO. 2:15-CV-251
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act were administratively denied following a hearing before an Administrative Law Judge. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 15 and 18].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff's medical history is summarized accurately in the Commissioner's brief as follows:

> On April 28, 2011, Plaintiff established primary care with Jeff Hopland, M.D. (Tr. 295-97). Plaintiff reported a history of hypertension, moderate back pain due to degenerative disc disease, moderate COPD, and sleep apnea treated with a continuous positive airway pressure (CPAP) machine (Tr. 295). Upon examination, Plaintiff had no edema, deformities, or tenderness in his extremities or spine (Tr. 296). He had a normal gait, normal balance, normal motor skills, intact sensation, and symmetrical reflexes (Tr. 296). Dr. Hopland filled Plaintiff's existing prescriptions and ordered additional laboratory workup (Tr. 296).
>
> Plaintiff returned to review his laboratory results with Dr. Hopland in June 2011 (Tr. 293). He reported moderate symptoms of hypertension and moderate neuropathy in his extremities (Tr. 293). A physical examination revealed a wart on Plaintiff's left hand (Tr. 294). On September 6, 2011, Plaintiff visited Dr. Hopland for medication refills (Tr. 291). He reported moderate back pain and requested a referral to a pain management clinic (Tr. 291).
>
> Two weeks later, Plaintiff visited Sheng Tchou, M.D., a certified pain management specialist, with complaints of low back pain radiating down his left leg since 1991 (Tr. 453). He rated his pain a 9 out of 10 (Tr. 453). Upon examination, Plaintiff walked with an antalgic gait favoring the right side (Tr. 453). He exhibited moderate to severe muscle spasms and limited range of motion in the low back (Tr. 453). He had moderate to severe tenderness in the lower back and hamstring muscles (Tr. 453-54). He also displayed some muscle weakness at the left knee extensors and cervical and lumbar musculature (Tr. 454). He could perform straight leg raises to 40 degrees on the left and 55 degrees on the right (Tr. 454). Plaintiff received deep tissue massage and epidural injections in his low back and hips (Tr. 454-55). Dr. Tchou prescribed pain medication and gave Plaintiff instructions on home stretching exercises (Tr. 454).

On October 6, 2011, Plaintiff returned to see Dr. Tchou at the pain management clinic (Tr. 448-49). He reported that treatment and medication helped, and he was doing his home exercise program as instructed (Tr. 448). Upon examination, Plaintiff had an improved range of motion in his lower back with moderate to severe muscle spasms (Tr. 448). The tenderness in his bilateral gluteus maximus, bilateral subscapular, and bilateral infraspinatus muscles decreased since the previous treatment (Tr. 448). Plaintiff received injections in his lower back and hips and was advised to continue his stretching exercises once a day (Tr. 448-49).

The next day, Plaintiff went to the emergency room with complaints of pain in his midback, neck, and both arms due to a fall (Tr. 256, 259). He rated his pain a 7 out of 10 (Tr. 259). Plaintiff reported that he smoked one package of cigarettes a day for 30 years (Tr. 259). Upon examination, Plaintiff had a limited range of motion in his left wrist and tenderness over his left arm and cervical spine (Tr. 260). X-rays of Plaintiff's arms, wrists, and hands showed no acute findings (Tr. 261, 264-67, 270-72). X-rays of his spine showed no acute fracture, stable degenerative changes at L5/S1, and disc space narrowing from degenerative disc disease at C3-4, C4-5, and C6-7 (Tr. 268, 273). Plaintiff was diagnosed with a cervical strain and left wrist contusion (Tr. 260). He received a muscle relaxer and was discharged home (Tr. 260).

On October 20, 2011, Plaintiff returned to the pain management clinic (Tr. 445). He stated that he fell and broke his wrist two weeks ago (Tr. 445). Upon examination, Plaintiff's low back range of motion and muscle tenderness continued to improve (Tr. 445). Plaintiff received injections in his lower back and hips and was instructed to continue with stretching exercises at home once a day (Tr. 445-46).

Plaintiff returned to see Dr. Tchou at the pain management clinic on November 3, 2011 (Tr. 442-43). He reported that his exercise program helped in daily activities and mobility (Tr. 442). His range of motion and muscle tenderness continued to improve (Tr. 442). Plaintiff received injections in his lower back and hips, and was advised to continue his home exercise program (Tr. 442-43).

Two days later, Plaintiff visited Dr. Hopland's office for medication refills (Tr. 289). He reported no symptoms of anxiety with medication, and his hypertension appeared well-controlled (Tr. 289). Plaintiff requested to have a wart on his hand surgically removed (Tr. 289).

On December 8, 2011, Plaintiff returned to the pain management clinic for low back and hip injections (Tr. 439-40). He reported that treatment, medication, and his exercise program continued to help (Tr. 439). His range of motion and muscle tenderness continued to improve (Tr. 439).

The following week, Plaintiff visited Dr. Hopland with complaints of a cough and runny nose (Tr. 287). An electrocardiogram (EKG) appeared within normal limits and a spirometry appeared restricted using an inhaler (Tr. 288). Dr. Hopland prescribed medication for an upper respiratory infection (Tr. 288).

Plaintiff returned to the pain management clinic for low back and hip

3

injections on December 21, 2011, and January 13, 2012 (Tr. 433-34, 436-37). He reported that treatment and medication continued to help, and his home exercise program helped in mobility and daily activities (Tr. 433, 436). Plaintiff's range of motion and muscle tenderness continued to improve (Tr. 433, 436).

On January 17, 2012, Plaintiff saw Dr. Hopland with reports of no improvement in his cough (Tr. 285). He said he had no appetite and felt fatigued (Tr. 285). Plaintiff received a Decadron injection for his cough (Tr. 285).

Plaintiff received injections in his lower back and hips at the pain management clinic on January 23, 2012, February 13, 2012, February 28, 2012, and March 13, 2012 (Tr. 418-31). He reported that treatment, medication, and his exercise program continued to help (Tr. 418, 421, 425, 429). His range of motion and muscle tenderness continued to improve (Tr. 429). Plaintiff was advised to continue his stretching exercises at home once a day (Tr. 420, 422, 426, 431).

On June 7, 2012, Plaintiff returned to the pain management clinic, reporting that he recently had his insurance reinstated after losing it in March 2012 (Tr. 415). Plaintiff continued doing his exercise program at home (Tr. 415). Plaintiff's range of motion decreased and his muscle tenderness increased, likely due to the lack of treatment and medication for several months (Tr. 415). Plaintiff received injections in his lower back and hips and was advised to continue with stretching exercises at home once a day (Tr. 415-16).

Plaintiff visited Dr. Hopland for medication refills on June 19, 2012 (Tr. 283). His hypertension was well controlled and his breathing had improved (Tr. 283). Dr. Hopland adjusted Plaintiff's medications and recommended cryo treatment for the wart on Plaintiff's left hand (Tr. 284).

Two days later, Plaintiff received injections in his lower back and hips at the pain management clinic (Tr. 412-13). He reported that treatment and medication helped, and his exercise program helped in daily activities (Tr. 412). Plaintiff's range of motion and muscle tenderness improved since the last visit (Tr. 412). Plaintiff was advised to continue with stretching exercises at home once a day (Tr. 412).

On June 25, 2012, Plaintiff followed up with Dr. Hopland regarding his laboratory results (Tr. 281). Dr. Hopland prescribed medication for high cholesterol (Tr. 282).

Plaintiff visited the pain management clinic for injections in his lower back and hips on July 10, 2012, and August 8, 2012 (Tr. 406-07, 409-10). He reported that treatment and medication continued to help, and his exercise program helped in daily activities and mobility (Tr. 406, 409). Plaintiff's range of motion and muscle tenderness continued to improve (Tr. 406, 409). He was advised to continue his stretching exercises at home once a day (Tr. 406, 409).

On August 14, 2012, Plaintiff complained to Dr. Hopland of a five-day history of extreme pain to the touch on the right side of his chest and back (Tr. 279). Dr. Hopland diagnosed shingles and prescribed a medicated patch (Tr. 280).

Plaintiff returned to the pain management clinic for injections in his lower back and hips on August 23, 2012, September 7, 2012, September 24, 2012, and

4

October 9, 2012 (Tr. 394-404). He reported that treatment, medication, and his exercise program helped (Tr. 394, 397, 400, 403). His range of motion and muscle tenderness continued to improve (Tr. 394, 397, 400, 403). Plaintiff was advised to continue his home stretching exercises (Tr. 394, 397, 400, 403).

On October 23, 2012, Plaintiff followed up with Dr. Hopland (Tr. 277). He complained of tooth pain and requested antibiotic medication (Tr. 277). Upon examination, Plaintiff had a broken tooth (Tr. 277). Dr. Hopland prescribed antibiotics and an EpiPen refill (Tr. 278).

Plaintiff returned to the pain management clinic for injections in his low back and hips on October 24, 2012 (Tr. 391-92). He reported that his dentist had prescribed narcotic medication for recent dental work (Tr. 391).

On November 2, 2012, Plaintiff completed a Function Report in connection with his application for disability (Tr. 218-24). He reported that he could not sit or stand for more than 30 minutes (Tr. 218). He stated that he did not do much of anything during the day, but would sit outside in nice weather (Tr. 219). He rotated between sitting and standing while watching television or listening to music (Tr. 222). He reported some problems with personal care every couple of days due to arm pain (Tr. 219). He did not do any cooking or housework because he dropped things and could not stand (Tr. 220). He stated that his body and health would not let him perform any house or yard work and certain movements would paralyze him (Tr. 221). He did not drive because he did not have a license and he did not trust his body and medicines (Tr. 221). He went shopping once in a while, but only for 10 to 15 minutes (Tr. 221). He spent time with family and watched movies with his children (Tr. 222). He said he could not do things with his body because his health, back, and medicines would not allow it (Tr. 223). He used a back brace with an electric shock box (Tr. 224).

Plaintiff returned to the pain management clinic for injections in his low back and hips on November 7, 2012 (Tr. 388-89). Dr. Tchou wrote a letter to Dr. Hopland, stating that Plaintiff's subjective complaints of pain had decreased from a 9/10 to a 5 on the pain scale, indicating a 50% improvement since the start of his pain rehabilitation program (Tr. 387). Plaintiff's active range of motion in the low back had returned to normal and his muscle spasms had subsided to mild (Tr. 387). Plaintiff's muscle tenderness had also decreased from severe to mild (Tr. 387). Dr. Tchou opined that Plaintiff's physical examination findings were more than 50% improved (Tr. 387). Dr. Tchou advised Plaintiff to continue his stretching home exercise program at least once a day for three months (Tr. 387). Dr. Tchou released Plaintiff back to Dr. Hopland's care (Tr. 387).

On November 21, 2012, Plaintiff visited Dr. Hopland's office with complaints of difficulty swallowing (Tr. 345). A physical examination showed no abnormality that would cause difficulty swallowing (Tr. 346). Plaintiff was referred to gastroenterology for barium swallow study (Tr. 346).

In connection with his application for disability benefits, Plaintiff attended a physical examination with Krish Purswani, M.D., on December 10, 2012 (Tr. 312). Plaintiff reported a 20-year history of constant low back pain (Tr. 312). He

said his pain increased with sitting more than 30 minutes, squatting, bending, lifting, or standing more than 30 to 45 minutes (Tr. 312). He stated that he needed to change positions frequently (Tr. 312). He said he was diagnosed with degenerative disc disease and scoliosis, and received treatment with lumbar epidural injections and pain medication (Tr. 312). Plaintiff also reported shortness of breath for two years (Tr. 312). He said he was a cigarette smoker for 35 years and had COPD and sleep apnea (Tr. 312). He used a CPAP machine and various inhalers (Tr. 312). Plaintiff reported that he was diagnosed with stomach cancer, but had no treatment since 2010 (Tr. 312). Plaintiff was diagnosed with shingles in August 2012, but his rash had resolved (Tr. 312). Plaintiff stated that he had chest pain two to three times a month, which resolved with Nitroglycerin (Tr. 313). He also reported a 16-year history of anxiety that was treated with medication and no counseling (Tr. 313).

    Upon examination, Plaintiff appeared comfortable with no apparent distress (Tr. 314). His gait and station were normal with no assistive devices (Tr. 314). He was able to get on and off the examination table with normal effort and without help (Tr. 314). He was able to follow instructions (Tr. 314). Plaintiff had no tenderness and a normal range of motion in his neck, shoulders, elbows, wrists, and hands (Tr. 314-15). He had a normal range of motion in his hips, knees, and ankles (Tr. 315). His knees showed some hypertrophy of both tibial tuberosities, but both knees were stable and nontender with no crepitus (Tr. 315). Plaintiff had mild levoscoliosis of the thoracic spine with no tenderness (Tr. 315). He could perform straight leg raises to 90 degrees in the supine position, and he had normal straight leg raises while sitting (Tr. 315). Plaintiff could stand on each foot and his tandem gait was normal (Tr. 315). A pulmonary function test showed forced vital capacity of 3.92 to 4.47 liters, and forced expiratory volume of 3.42 to 3.59 liters (Tr. 317). Plaintiff was unable to blow a full six seconds (Tr. 318). Dr. Purswani opined that Plaintiff could frequently lift 30 pounds half of the time in an 8-hour day from the floor (Tr. 315). He stated that Plaintiff could stand and walk for 7 hours in an 8-hour day and sit for 8 hours in an 8-hour day (Tr. 316).

    On December 12, 2012, Plaintiff attended a psychological evaluation with Chad R. Sims, Ph.D. (Tr. 324-29). Plaintiff reported a history of anxiety (Tr. 326). He had never seen a mental health professional for outpatient treatment, but primary care providers had prescribed psychiatric medications for anxiety (Tr. 326). Plaintiff stated that he lost his driver's license in 1989, but he drove to the appointment (Tr. 328). His hobbies included playing with his children and watching movies (Tr. 328). Plaintiff appeared to fall into the low average range of intellectual functioning (Tr. 329). He had no evidence of impairment in his short-term, long term, or remote memory, and no evidence of impairment in his ability to sustain concentration (Tr. 329). Plaintiff's psychiatric state was euthymic with no evidence of impairment in social relating (Tr. 329). He showed no evidence on impairment in his ability to adapt to change and appeared to follow written and spoken instructions (Tr. 329). Dr. Sims assessed Plaintiff with a history of anxiety disorder, criteria not currently met, and rule out borderline intellectual functioning

6

(Tr. 329). He gave Plaintiff a global assessment of functioning (GAF) score of 71 to 75 (Tr. 329).

Plaintiff followed up with Dr. Hopland on December 12, 2012 (Tr. 345-46). His hypertension, COPD and cholesterol were stable (Tr. 344). Dr. Hopland recommended additional blood work (Tr. 346). On December 26, 2012, Saul Juliao, M.D., a state agency reviewing physician, reviewed the medical records and opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday (Tr. 75). Dr. Juliao stated that Plaintiff could occasionally climb ladders, ropes, or scaffolds and frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (Tr. 75). He opined that Plaintiff should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation (Tr. 76).

On December 26, 2012, Plaintiff went to the emergency room with complaints of abdominal pain (Tr. 331). He reported nausea, vomiting, and diarrhea, and rated his pain intensity at four (Tr. 331). A CT scan of his abdomen and pelvis showed no acute process (Tr. 336). Plaintiff's symptoms improved with medication and he was discharged home in stable condition (Tr. 335).

Plaintiff followed up with Dr. Hopland's office on December 28, 2012 (Tr. 341-42). He reported persistent lower abdominal pain (Tr. 341). A chest x-ray showed no active cardiopulmonary disease (Tr. 347). Plaintiff was advised to follow a low calorie diet (Tr. 342).

On January 2, 2013, Plaintiff visited Tri-Cities Gastroenterology for further evaluation (Tr. 356). He reported difficulty swallowing both liquids and solids (Tr. 356). An esophageal endoscopy was consistent with gastroduodenitis (Tr. 354-55). The doctor recommended an anti-reflux regiment and gastroesophageal reflux disease ("GERD") diet (Tr. 355).

Plaintiff completed a Disability Report on February 4, 2013, stating that his back pain had increased and his stomach problems/cancer had been worse for three months (Tr. 227). He reported that his medications caused dizziness, shakiness, weakness, and fatigue (Tr. 230). Plaintiff stated that he was in constant pain and could hardly do anything (Tr. 231).

On March 18, 2013, Plaintiff visited Dr. Hopland's office with complaints of right leg pain (Tr. 474). Plaintiff stated that he experienced sudden pain under his right kneecap while walking a few days earlier (Tr. 474). He said he took over-the-counter pain medications with no relief (Tr. 474). Upon examination, Plaintiff's right knee was mildly swollen (Tr. 475). X-rays showed no evidence of fracture, dislocation, or focal soft tissue abnormality (Tr. 476). Plaintiff received an injection in his right knee (Tr. 473, 475).

On April 19, 2013, Anita Johnson, M.D., a state agency reviewing physician, reviewed the record and opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour day; and sit about 6 hours in an 8-hour day (Tr. 106). Dr. Johnson opined that Plaintiff could frequently balance, stoop, kneel, crouch, crawl, and

7

climb ramps, stairs, ladders, ropes, and scaffolds (Tr. 106-07). Dr. Johnson opined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights (Tr. 107).

Plaintiff returned to see Dr. Hopland with complaints of right knee pain on May 20, 2013 (Tr. 471). Upon examination, Plaintiff's right knee was mildly swollen (Tr. 472). Dr. Hopland referred Plaintiff to physical therapy (Tr. 472).

On June 19, 2013, Plaintiff visited Dr. Hopland's office to discuss a pneumonia shot and medication refills (Tr. 469). Plaintiff described his COPD as moderate (Tr. 469). Upon examination, Plaintiff had some knee pain (Tr. 470). He received a pneumovax and TDaP immunization (Tr. 470).

On July 9, 2013, Plaintiff visited Dr. Hopland and requested a referral for evaluation of his right knee pain and joint swelling (Tr. 467). The following week, an MRI scan showed a loose body and a small superficial tear of the cartilage lateral facet patella (Tr. 458). Plaintiff also had a small subchondral cyst and subchondral edema of the medial femoral condyle, and a small focus of subchondral edema of the central aspect of the medial tibial plateau (Tr. 458).

Plaintiff visited Bruce M. Miller, M.D., for evaluation of his right knee on August 20, 2013 (Tr. 374). Upon examination, Plaintiff ambulated with an antalgic limp to the right side (Tr. 374). He reported tenderness with certain movements but his knee was stable and neurologically intact (TR. 374). Dr. Bruce recommended arthroscopic loose body removal (Tr. 374).

Plaintiff returned to Dr. Hopland's office on August 27, 2013 (Tr. 465-66). He complained of right knee pain, and stated that he had scheduled surgery with Dr. Miller (Tr. 465). Plaintiff described his knee pain as moderate (Tr. 465). Dr. Hopland assessed Plaintiff with stable hypertension, stable back pain, and stable COPD (Tr. 466). Plaintiff received a referral to the pain management clinic (Tr. 466).

Plaintiff visited Dr. Hopland's office with complaints of swelling of left elbow on September 6, 2013 (Tr. 463). Upon examination, Plaintiff had some swelling of the left olecranon bursa (Tr. 464).

On September 12, 2013, Plaintiff underwent arthroscopic right knee surgery with removal of multiple small loose bodies (Tr. 378).

Plaintiff presented to the pain management clinic on September 16, 2013, with complaints of low back pain radiating down his right leg (Tr. 383). Plaintiff rated his pain a seven on the pain scale (Tr. 383). He stated that activities such as sitting too long and walking any distance increase the pain (Tr. 383). Upon examination, Plaintiff had a decreased range of motion and moderate to severe muscle spasms in his low back (Tr. 383). He had moderate to severe tenderness and some muscle weakness in his low back and right hip (Tr. 383-84). Plaintiff received injections in his lower back and right hip and was advised to continue with stretching exercises at home once a day (Tr. 384-85).

On September 24, 2013, Plaintiff visited Dr. Miller for a routine follow up of his knee (Tr. 373). He had no complaints (Tr. 373). Upon examination, Plaintiff's incisions were healing nicely with no signs of infection (Tr. 373).

Plaintiff had intact motor and sensory skills and an excellent range of motion with no significant joint effusion (Tr. 373). Dr. Miller explained that Plaintiff would be sore for two or three months until the microfracture healed, but he encouraged Plaintiff to resume activities as tolerated (Tr. 373). Dr. Miller assessed no restrictions or precautions (Tr. 373).

Plaintiff received injections in his lower back and hips at the pain management clinic on September 26, 2013 (Tr. 380). Plaintiff reported that the treatment and medication helped (Tr. 380). He started doing home exercises as instructed (Tr. 380). He had more range of motion in his low back and some improvement in muscle tenderness (Tr. 380). Plaintiff was advised to continue with stretching exercises at home once a day (Tr. 380-81).

On October 15, 2013, Plaintiff visited Dr. Hopland's office and requested an MRI scan of his right shoulder (Tr. 461). An MRI scan later that month showed an old avulsion of the clavicle producing some mass effect upon the supraspinatus musculotendinous junction, but no significant findings (Tr. 457).

Plaintiff returned to Dr. Hopland's office on November 19, 2013, with complaints of right ear pain (Tr. 459). Plaintiff denied any joint or muscle pain (Tr. 459). Plaintiff received antibiotic medication (Tr. 460).

[Doc. 19, pgs. 3-15].

At the administrative hearing, the ALJ took the testimony of Ms. Donna Bardsley, a vocational expert ["VE"]. He first asked her to assume the plaintiff, who was 51 years of age with a limited education with past relevant work experience which was heavy with no transferable skills, had the capabilities and limitations set out in the opinion of State Agency physician Dr. Anita Johnson at Tr. 121-124. These were described in his question to the VE as being able to occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks for six hours in an eight hour workday; push or pull the amounts of weight set forth above; and to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, hazards, machinery, and heights. When asked if jobs existed the person could do, Ms. Bardsley stated that the person could do the jobs of general laborer, with 4,500 in the region and 3,500,000 in the nation;

9

cleaner, with 2,000 in the region and two million in the nation; hand packager, with 3,100 in the region and 675,000 in the nation; sorter, with 1,900 in the region and 375,000 in the nation; assembler, with 2,500 in the region and 450,000 in the nation; inspector, with 2,000 in the region and 295,000 in the nation; and food service related occupations, with 3,600 in the region and three million in the nation. (Tr. 41-44). If plaintiff's testimony were completely credible, Ms. Bardsley opined that there would be no jobs he could perform.

On April 14, 2014, the ALJ published his hearing decision. He found that the plaintiff was not engaging in substantial gainful activity and had not done so since April 1, 2009, his alleged onset date. He then found that the plaintiff had severe impairments, which were found by the ALJ to be disorders of the cervical and lumbar spine and chronic obstructive pulmonary disease. He found that the plaintiff's heart problems were not severe. Likewise, he found that the plaintiff had not had stomach cancer or other gastric disorders which were severe impairments. He found that the plaintiff's sleep apnea was controlled with a CPAP device and was not severe. Finally, he found that the plaintiff had no severe mental impairments. (Tr. 14).

After finding that the plaintiff did not have an impairment or combination of impairments that met or equaled any listed impairments, the ALJ addressed his finding of the plaintiff's residual functional capacity ["RFC"], which was identical to the slightly reduced range of light work set out above in his hypothetical question to Ms. Bardsley, the VE, at the administrative hearing. (Tr. 15). He then set out to articulate what he

believed was the substantial evidence that supported this finding.

He first noted that the plaintiff alleged disability due to back problems, sleep apnea, COPD, emphysema, anxiety and possible stomach cancer. This information was in the plaintiff's disability report, dated October 26, 2012 which he filed with the Commissioner (Tr. 201). The ALJ pointed out that the plaintiff had stopped working when he was laid off from his last job on February 15, 2009, shortly before his alleged disability onset date of April 1, 2009. (Tr. 15).

The ALJ then described the medical evidence as described hereinabove. These included treatment notes from Dr. Hopland of Medical Care PLLC, his primary care doctor; the Johnson City Medical Center emergency room; Dr. Puswani, the consultative examiner for the State Agency; Dr. Sims, the consultative psychological examiner; Dr. Fenyves who has treated plaintiff's digestive conditions; Dr. Bruce Miller, an orthopedist who treated plaintiff for knee pain which resulted in arthroscopic surgery in September of 2012; Appalachian Pain Rehab Associates and Dr. Sheng Tchou; and the evaluations by State Agency non-examining physicians and psychologists. (Tr. 15-18).

The ALJ then noted that since the last prior adverse decision (Tr. 50-61) on August 9, 2011, the plaintiff's physical RFC had become more restrictive, while his mental impairment symptoms had improved from mild to no restrictions (Tr. 19).

The ALJ then described the weight given to the various medical and psychological examiners and evaluators. He gave great weight to the State Agency physicians and psychologists. He gave "other" weight to the opinions of Dr. Purswani, which the State

11

Case 2:15-cv-00251-JRG-MCLC   Document 20   Filed 07/06/16   Page 11 of 18   PageID #: 582

Agency physicians found overestimated the plaintiff's physical capabilities. He gave more weight to Dr. Sims, finding that the plaintiff's anxiety is well-controlled and caused no functional limitations. (Tr. 19).

The ALJ discussed plaintiff's credibility. He noted the lack of support in the medical evidence for plaintiff's testimony regarding his physical limitations. He noted improvement in the medical records when plaintiff was treated with injections, exercise and medication. He noted plaintiff had stated that he had suffered back pain since his twenties, but had worked at heavy jobs until he was laid off while in his late forties. He mentioned that plaintiff stated he could not drive because he could not trust his body's reaction to his medications, but drove to the consultative psychological exam. He noted plaintiff's description of his limited activities, but posited that if the plaintiff's spouse works full-time, it was likely plaintiff did at least some chores at home since four children were still living at home. The ALJ noted the exercise program recently prescribed by Appalachian Pain Rehab. Thus, the ALJ presumed "that any further restrictions in the claimant's activities of daily living are voluntary in nature." (Tr. 19-20).

Based upon the plaintiff's age, education and vocational characteristics, the ALJ found that there were jobs in significant numbers in the national economy which the plaintiff could perform. The ALJ noted that under Social Security Ruling ["SSR"] 83-11, if a person could "perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules [the "Grid"] direct a conclusion of either

12

'disabled' or 'not disabled….'" (Tr. 20). He stated that otherwise, SSR 83-12 and SSR 83-14 allowed the use of the Grid as a framework for decision making, unless a particular Grid rule indicated a person was disabled without regard to any additional exertional or nonexertional limitations which precluded a full or substantially full range of work at a given exertional level. He likewise noted that under SSR 85-15, if a person "has solely nonexertional limitations, section 204.00" of the Grids provides for their use as a framework for decision making. (Tr. 20-21). He then stated "based on a residual functional capacity for the full range of light work, considering the claimant's age, education and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.11." (Tr. 21). Accordingly, the ALJ found that the plaintiff was not disabled. *Id.*

Plaintiff asserts that the ALJ erred in two ways. First, he states that the ALJ erred in applying the Grid while finding that the plaintiff was capable of a less than full range of light work. Second, he complains that the ALJ did not properly address plaintiff's problems with his shoulder and his knee.

With respect to the use of the Grid, plaintiff asserts that "[t]he additional nonexertional limitations of needing to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., and hazards (machinery, heights, etc.) would certainly eliminate the ability to perform the full range of light work. Therefore the ALJ's application of the Grid Rules to deny benefits at step five was made in error." [Doc. 16, pg 10]. Plaintiff then argues that since his situation does not exactly match the criteria of

13

Rule 202.11, the ALJ was required to utilize a VE to meet the burden of showing a significant number of jobs at step five that the plaintiff could perform.

Plaintiff relies on *Damron v. Secretary of Health & Human Services*, 778 F.2d 279 (6th Cir. 1985). In that case, the ALJ found that the plaintiff had the residual functional capacity to perform "at least light work on a sustained basis." *Id.* at 281. He utilized Rule 202.10 of the Grid to find that she was not disabled. *Id*. The Sixth Circuit found that the ALJ "completely failed to consider the effect of non-exertional limitations upon Damron's ability to find work in the national economy…" which were found by plaintiff's treating physician and were not contradicted by other evidence. *Id*. at 281-282. That treating physician "totally restricted Damron from environments that would expose her to dust, gases, fumes, and marked changes in temperature and humidity. He further totally restricted her from activities involving unprotected heights and being around moving machinery." *Id*, at 282. The Court concluded that

> [t]he Grid is not fully applicable when the claimant suffers from a nonexterional impairment such as an environmental restriction. 20 C.F.R. 404 Appendix 2 of Supart P. Rule 200.00(e) provides that where an individual has both strength limitations and nonexertional limitations the grid is a 'framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.' Given Dr. May's severe restrictions as to environment and working conditions, it was incumbent upon the ALJ to hear from a vocational specialist to determine whether or not jobs existed in the national economy that Damron could still perform, taking those restrictions into account.

14

*Id*.

The present case appears to be on all fours with *Damron* regarding the issue of reliance solely on the Grid given plaintiff's non-exertional limitations. This is further underscored by Social Security Ruling ["SSR"] 83-14, 1983 WL 31254, which gives adjudicative guidance on the use of the Grid as a framework for decision when evaluating a combination of exertional and nonexertional impairments. It particularly states with respect to light exertion combined with a nonexertional impairment that some restrictions would totally preclude the use of the Grid while others, such as a "need to avoid exposure to feathers," would not. *Id.* at pgs 4-5. Most importantly, that ruling states that "[w]here nonexertional limitations or restrictions within the light work category are between the examples above, a decision maker will often require the assistance of a VS [VE]." *Id.*

There is no meaningful distinction between the present case and *Damron*, other than the fact that the ALJ here found in his RFC finding that the very same nonexertional limitations exist as opposed to the treating physician in *Damron*. Thus, it is clear that the Sixth Circuit considers the nonexertional limitations present here to preclude the use of the Grid.

However, although the ALJ did not discuss or rely upon the testimony of the VE in his ultimate finding which he elected to base entirely upon the Grid, the testimony of Ms. Bardsley does exist. As stated above in recounting her testimony, she identified millions of light jobs which the plaintiff could perform with his nonexertional impairments. While the plaintiff is correct that *Damron* precludes the use of the Grid as

15

the final yardstick, a remand would be useless on this basis because the VE identified such a substantial number of jobs at the hearing. So many jobs, in fact, that an argument could be made that her testimony showed that the plaintiff's nonexertional restrictions did not significantly compromise the light job base to such an extent as to make reliance on the Grid proper in this case. In any event, given the VE's testimony, any error by use of the Grid is found to be harmless.

Plaintiff also asserts that the ALJ's RFC finding itself was inadequate because it did not take into account problems plaintiff experienced with his right knee and right shoulder while his applications were pending before the Commissioner. Specifically, plaintiff asserts that the ALJ erred in not finding that these were severe impairments.

With respect to the right knee, plaintiff first complained of pain in March of 2013. An x-ray taken at the time revealed no fracture, dislocation or local soft tissue anomaly (Tr. 474-476). Plaintiff's pain persisted however, and an MRI of the right knee was performed on July 15, 2013 (Tr. 458). Plaintiff was referred to Dr. Bruce M. Miller, and orthopedic surgeon. Dr. Miller reviewed the MRI and agreed that there was either a cyst or a loose body in the knee. After explaining the condition to the plaintiff, Dr. Miller scheduled surgery (Tr. 374). Dr. Miller arthroscopically removed multiple small loose bodies from the knee on September 12, 2013 (Tr. 378-379). On September 24, 2013, plaintiff had a follow up visit with Dr. Miller and had "no complaints." Although the plaintiff could expect to be sore while the knee healed, he was to resume normal activities as tolerated. Plaintiff had an excellent range of motion in the knee. Dr. Miller placed no

16

restrictions or precautions on the plaintiff. (Tr. 373). All of this was noted by the ALJ in the hearing decision (Tr. 17-18).

Plaintiff testified that his knee pain continued. However, at subsequent visits to his primary care provider, Medical Care, PLLC, on October 15, 2013 and November 19, 2013, the office notes are silent as to any continuing complaints of knee pain or treatment regarding his knee (Tr. 459-462). In fact, at the November 19th visit, plaintiff specifically denied any joint pain (Tr. 459). It would make no sense for the plaintiff to remain silent regarding a condition he testified caused him such a great amount of discomfort.

The ALJ discussed the medical history of the plaintiff's treatment for his right knee. Based upon that objective evidence, which indicates a full recovery by the plaintiff, he was justified in not finding this to be a severe impairment.

With regard to the plaintiff's shoulder, an MRI was performed. While it showed a problem "producing some mild mass effect upon the supraspinatus musculotendinous junction," with "no significant findings noted at MRI imaging…." (Tr. 457), there is no record of any further treatment, much less restrictions, by any medical source. Once again, the ALJ did not err in failing to find that this was a severe impairment.

Finally, with respect to both the knee and shoulder, the ALJ's RFC finding limited the plaintiff to light exertion. There is no indication in the medical records that this would not completely accommodate any objectively determinable difficulties the plaintiff may experience with either of them.

Therefore, the Court finds that the ALJ's RFC finding is supported by substantial

evidence, and that he committed no reversible errors in his adjudication of this case. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 15] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 18] be GRANTED.[1]

                Respectfully submitted,


                                  s/ Clifton L. Corker
                                  United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).